IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| MELANIE M., | CV 21-28-BLG-KLD |
| Plaintiff, | |
| vs. | ORDER |
| KILOLO KIJAKAZI, Acting Commissioner of Social Security, | |
| Defendant. | |

Plaintiff brings this action under 42 U.S.C. § 405(g) seeking judicial review of a decision by the Commissioner of Social Security denying her application for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401 et seq.

I.   **Procedural Background**

Plaintiff protectively filed application for Title II disability insurance benefits in August 2018, alleging disability since March 24, 2018 based on physical and mental impairments. (Doc. 10, at 190). Plaintiff later amended her alleged onset date to June 18, 2018. (Doc. 10, at 213). Plaintiff's claim was denied initially and on reconsideration, and by an ALJ after an administrative hearing. (Doc. 10, at 96, 110, 19-35). The Appeals Council denied Plaintiff's request for review, thereby making the ALJ's decision dated August 18, 2020, the agency's

1

final decision for purposes of judicial review. (Doc. 10, at 5-7). Jurisdiction vests with this Court pursuant to 42 U.S.C. § 405(g).

## II.   <u>Legal Standards</u>

### A.   **Standard of Review**

42 U.S.C. § 405(g) provides a limited waiver of sovereign immunity, allowing for judicial review of social security benefit determinations after a final decision of the Commissioner made after a hearing. See *Treichler v. Commissioner of Social Sec. Admin.*, 775 F.3d 1090, 1098 (9th Cir. 2014). A court may set aside the Commissioner's decision "only if it is not supported by substantial evidence or is based on legal error." *Treichler*, 775 F.3d at 1098 (quoting *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995)). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Widmark v. Barnhart,* 454 F.3d 1063, 1070 (9th Cir. 2006). "The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities." *Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir. 2001). "Where evidence is susceptible for more than one rational interpretation," the court must uphold the ALJ's decision. *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005). "Finally, the court will not reverse an ALJ's decision for harmless error, which exists when it is clear from the record that 'the ALJ's error was inconsequential to the ultimate nondisability determination.'" *Tommasetti v.*

*Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008) (quoting *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 885 (9th Cir. 2006)).

### B.    Disability Determination

To qualify for disability benefits under the Social Security Act, a claimant bears the burden of proving that (1) she suffers from a medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of twelve months or more; and (2) the impairment renders the claimant incapable of performing past relevant work or any other substantial gainful employment that exists in the national economy. 42 U.S.C. §§ 423(d)(1)(A), 423(d)(2)(A). See also *Batson v. Commissioner of Soc. Sec. Admin.*, 359 F.3d 1190, 1193-94 (9th Cir. 2004).

In determining whether a claimant is disabled, the Commissioner follows a five-step sequential evaluation process. 20 C.F.R. §§ 404.1520 and 416.920. If a claimant is found to be "disabled" or "not disabled" at any step, the ALJ need not proceed further. *Ukolov v. Barnhart*, 420 F.3d 1002, 1003 (9th Cir. 2005). The claimant bears the burden of establishing disability at steps one through four of this process. *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).

At step one, the ALJ considers whether the claimant is engaged in substantial gainful activity. 20 C.F.R. §§ 404.1520(a)(4)(i) and 416.920(a)(4)(i). If so, then the claimant is not disabled within the meaning of the Social Security Act.

At step two, the ALJ must determine whether the claimant has any impairments, singly or in combination, that qualify as severe under the regulations. 20 C.F.R. §§ 404.1520(a)(4)(ii) and 416.920(a)(4)(ii). If the ALJ finds that the claimant does have one or more severe impairments, the ALJ will proceed to step three.

At step three the ALJ compares the claimant's impairments to the impairments listed in the regulations. 20 C.F.R. §§ 404.1520(a)(4)(iii) and 416.920(a)(4)(iii). If the ALJ finds at step three that the claimant's impairments meet or equal the criteria of a listed impairment, then the claimant is considered disabled. 20 C.F.R. §§ 404.1520(a)(4)(iii) and 416.920(a)(4)(iii).

If the ALJ proceeds beyond step three, she must assess the claimant's residual functional capacity. The claimant's residual functional capacity is an assessment of the work-related physical and mental activities the claimant can still do on a regular and continuing basis despite his limitations. 20 C.F.R. §§ 404.1545(a), 416.945(a); Social Security Ruling (SSR) 96-8p. The assessment of a claimant's residual functional capacity is a critical part of steps four and five of the sequential evaluation processes.

At step four, the ALJ considers whether the claimant retains the residual functional capacity to perform his past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv) and 416.920(a)(4)(iv). If the claimant establishes an inability to

4

engage in past work, the burden shifts to the Commissioner at step five to establish that the claimant can perform other work that exists in significant numbers in the national economy, taking into consideration claimant's residual functional capacity, age, education, and work experience. 20 C.F.R. §§ 404.1520(a)(4)(v) and 416.920(4)(v). The ALJ may satisfy this burden through the testimony of a vocational expert or by referring to the Medical-Vocational Guidelines set forth in the regulations at 20 C.F.R. part 404, subpart P, appendix 2. If the ALJ meets this burden, the claimant is not disabled.

## III.  Discussion

The ALJ followed the five-step sequential process in evaluating Plaintiff's claim. At step one, the ALJ found Plaintiff met the insured status requirements of the Social Security Act through December 31, 2020. (Doc. 10, at 22). The ALJ further found that Plaintiff had not engaged in substantial gainful activity since the June 18, 2018 amended alleged onset date. (Doc. 10, at 22). At step two, the ALJ found that Plaintiff had the following severe impairments: obesity, headaches, depression, anxiety, and substance abuse. (Doc. 10, at 22). At step three, the ALJ found Plaintiff did not have an impairment or combination of impairments that met or medically equaled any impairment described in the Listing of Impairments, 20 C.F.R. §§ 404.1520(d), 416.920(d); 20 C.F.R. pt. 404, subpt. P, app. 1. (Doc. 10, at 24).

The ALJ then found that Plaintiff had the residual functional capacity to perform a range of light work as follows:

> [S]he can lift/carry/push/pull 20 pounds occasionally, and 10 pounds frequently. She can stand and/or walk for about six hours in an 8-hour workday, and can sit for about six hours in an 8-hour workday. She can frequently climb ramps or stairs. She can frequently balance and stoop. She can occasionally climb ladders, ropes, or scaffolds. She can occasionally crouch and crawl. The claimant must avoid concentrated exposure to extreme noise, i.e., she can tolerate noise levels of 3/5. She must avoid concentrated exposure to vibration and work hazards. The claimant can understand, remember, and carry out simple tasks, and can maintain attention, concentration, persistence, and pace for such tasks for an 8-hour workday and 40-hour workweek. She can tolerate occasional interaction with supervisors, co-workers, and the public. She cannot work in tandem with supervisors and co-workers. She cannot deal with the public as part of her work duties. She can tolerate usual simple work situations and make simple judgments and decisions. She can tolerate occasional changes in a routine work setting and make occasional simple decisions.

(Doc. 10, at 28). At step four, the ALJ determined that Plaintiff was unable to perform past relevant work as a cashier, cook, janitor, and personal care attendant. (Doc. 10, at 33). Proceeding to step five, the ALJ concluded there were other jobs existing in significant numbers in the national economy that Plaintiff could perform, including unskilled light work as a price marker/checker, mail sorter, and packing line worker. (Doc. 10, at 34).

Plaintiff argues the ALJ's decision is not supported by substantial evidence, and raises seven main issues on appeal. (Doc. 12, at 11-12). First, Plaintiff argues the ALJ erred by not including somatization disorder and right-hand tremor as severe impairments at step two. Second, Plaintiff contends the ALJ improperly

6

assessed the medical opinion evidence. Third, Plaintiff maintains the ALJ failed to

comply with Social Security Ruling (SSR) 19-4p when evaluating her headaches.

Fourth, Plaintiff contends the ALJ did not provide clear and convincing reasons for

discounting her subjective testimony. Fifth, Plaintiff argues the ALJ did not

provide germane reasons for discounting a lay witness statement provided by her

sister. Sixth, Plaintiff maintains the ALJ failed to consider the frequency and

duration of her treatment as required by Social Security Ruling (SSR) 96-8p, when

assessing Plaintiff's residual functional capacity. Finally, Plaintiff argues the ALJ

erred by failing to incorporate all of her impairments and resulting limitations into

a hypothetical question presented to the vocational expert.

### A.    Severe Impairments

Plaintiff argues the ALJ erred by not including a right-hand tremor and

somatization disorder as severe impairments at step two.

The step two "inquiry is a de minimis screening device [used] to dispose of

groundless claims." *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1990). At this

step in the sequential evaluation process, the claimant has the burden of providing

medical evidence of signs, symptoms, and laboratory findings demonstrating that

she has a severe impairment or combination of impairments that hast lasted or can

be expected to last for a continuous period of not less than twelve months. *Ukolov

v. Barnhart*, 420 F.3d 1002, 1004-05 (9th Cir. 2005); *see also* 20 C.F.R. §§

404.1509, 404.1520(a)(4)(ii), 416.909, 416.920(a)(4)(ii). A severe impairment is one that significantly limits the claimant's "physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c), 416.920(c). "An impairment is not severe if it is merely 'a slight abnormality (or combination of slight abnormalities) that has no more than a minimal effect on the ability to do basic work activities." *Webb v. Barnhart*, 433 F.3d 683, 686 (9th Cir. 2005) (quoting Social Security Ruling (SSR) 96-3p). When the ALJ determines that a claimant has at least one severe impairment, she must consider all impairments, including non-severe impairments, at subsequent steps of the sequential evaluation. *Smolen*, 80 F.3d at 1290.

  1. <u>Hand tremor</u>

  The ALJ agreed that Plaintiff's hand tremor was a medically determinable impairment, but found it was not severe because there was no evidence that it would have more than a minimal effect on her ability to function. (Doc. 10, at 23). Plaintiff argues that in making this determination, the ALJ overlooked medical records from Dr. Justin Watkins and Dr. Blackshear Bryan demonstrating that her hand tremor was a severe impairment. (Doc. 12, at 25). But review of the record shows otherwise.

  In January 2019, consultative examiner Dr. Watkins observed that Plaintiff had an "intention tremor" of the right hand more so than the left. (Doc. 10, at 475).

Dr. Watkins indicated that the "[t]remor was not consistently present," however, as Plaintiff did not have a tremor when pointing out pain in her neck, but did have a right tremor when doing grip strength and reaching if she was asked to hold her arms out. (Doc. 10, at 475). In closing, Dr. Watkins wrote that Plaintiff's tremor did "not appear to be entirely consistent with a resting or intentions type tremor, it is unilateral and inconsistent in nature, concerning for possible psychogenic or other neurologic disorder." (Doc. 10, at 478). Notwithstanding any tremor, Dr. Watkins found that Plaintiff exhibited normal grip strength and normal upper extremity strength, and opined that she could "handle objects with both gross and fine manual motor dexterity." (Doc. 10, at 475-76, 478). In July 2020, Dr. Bryan noted that although Plaintiff had "an intermittent tremor in her right hand which seems to be worse with stress," motor testing showed "normal and symmetric strength in the upper and lower extremities." (Doc. 10, at 653).

The ALJ thoroughly discussed the medical records relating to Plaintiff's hand tremor, including those provided by Dr. Watkins and Dr. Bryan. (Doc. 10, at 23). The ALJ cited evidence reflecting that Plaintiff's tremor was a longstanding condition that had been present for nearly two decades, and during that time it had not prevented her from engaging in work activities and basic activities of daily living. (Doc. 10, at 23; 205-207; 210-13; 249-256). The ALJ found "no evidence of progression of tremor requiring consistent evaluation and treatment over a 12-

month period," and ultimately determined that Plaintiff's tremor would have no more than a minimal effect on her ability to function. (Doc. 10, 23).

In reaching this determination, the ALJ expressly considered and credited the medical records provided by Dr. Watkins and Dr. Bryan. Plaintiff does not point to any medical evidence that her tremor was getting progressively worse, or that it had anything more than a minimal effect on her ability to perform basic work activities. To the extent Plaintiff argues her subjective testimony demonstrates that her hand tremor caused significant limitations and was a severe impairment (Doc. 12, at 25-26), the ALJ properly discounted her testimony as discussed below. For these reasons, the ALJ's step two assessment that Plaintiff's hand tremor was not a severe impairment is supported by substantial evidence.

2.    Somatization Disorder

Plaintiff points to an August 2018 neuropsychological consultation report by Dr. Joesph McElhinny (Doc. 10, at 368-370) in support of her claim that the ALJ should have categorized her somatization disorder as a severe impairment. (Doc. 12, at 19, 24). In his assessment summary, Dr. McElhinny wrote that Plaintiff "appears to have a somatization disorder which is seemingly longstanding based on her reported background and history," and listed "[s]omatic symptom disorder, moderate to severe" as a diagnosis. (Doc. 10, at 370).

Although the ALJ did not address Plaintiff's somatization disorder at step two, she considered Dr. McElhinny's report later in the sequential evaluation process when assessing Plaintiff's residual functional capacity. (Doc. 10, at 30). The ALJ discussed Dr. McElhinny's clinical findings, and the fact that he found Plaintiff had depression and anxiety-related disorders that were, at least in part, causing her problems with attention and concentration. (Doc. 10, at 30). The ALJ further noted that, based on Dr. McElhinny's report, Plaintiff "also appears to have a somatization disorder, which was seemingly longstanding based on her reported background and history." (Doc. 20, at 661).

Plaintiff repeatedly refers to Dr. McElhinny's diagnosis, but does not cite to any medical evidence demonstrating that her somatization disorder caused any limitations beyond those already accounted for the in residual functional capacity assessment. Consistent with Dr. McElhinny's opinion, the ALJ found that Plaintiff's anxiety and depression were severe impairments, and included several non-exertional mental limitations in her residual functional capacity determination. (Doc. 10, at 22, 28). Dr. McElhinny did not opine that Plaintiff's apparent somatization disorder caused any specific functional limitations, and Plaintiff does not point to any medical evidence that the disorder significantly limited her ability to perform basic work activities as required for it qualify as a severe impairment.

Even if the ALJ did err at step two by not classifying somatization disorder as a severe impairment, the error was harmless because the ALJ addressed Dr. McElhinny's opinion, including the somatization disorder diagnosis, later in the sequential evaluation process when assessing Plaintiff's residual functional capacity. See *Burch v. Barnhart*, 400 F.3d 676, 682–82 (9th Cir. 2005) (an ALJ's failure to find a particular impairment severe at step two is harmless error where the impairment was considered in determining the claimant's residual functional capacity); *Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007) (holding that where the ALJ considered evidence relating to an impairment at step four, any error in failing to identify that impairment as severe at step two was harmless).

## B.    Medical Opinion Evidence

Plaintiff argues the ALJ erred in weighing the medical opinion evidence and failed to provide clear and convincing reasons for discounting the opinions of her treating physicians. (Doc. 12, at 33).

For all claims filed after March 27, 2017, the Social Security Administration has amended the rules regarding the evaluation of medical opinion evidence at the administrative level. See Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01 (Jan. 18, 2017). Because Plaintiff filed her claim for disability benefits in August 2018, the amended regulations apply in this case.

The amended regulations do away with the traditional hierarchy between treating, examining, and non-examining physicians, and instead direct the ALJ to consider all medical opinions and prior administrative medical findings, and evaluate their persuasiveness using several listed factors. 20 C.F.R. §§ 404.1520c(a), 416.920(a). Those factors include supportability, consistency, relationship with the claimant, specialization, and "other factors that tend to support or contradict a medical opinion or prior administrative medical finding." 20 C.F.R. §§ 404.1520c(c), 416.920(c).

While the new regulations eliminate the hierarchy between treating, examining, and non-examining medical sources, the ALJ must still provide legally sufficient reasons supported by substantial evidence for finding a medical opinion unpersuasive. *Beason v. Saul*, 2020 WL 606760, *3 (C.D. Cal. Feb. 7, 2020). The "new regulations still require the ALJ to explain his or her reasoning to specifically address how he or she considered the supportability and consistency of the medical opinion." *Brandee M.*, 2021 WL 2781803, at *3 (citing 20 C.F.R. §§ 404.1520c, 416.920c).

Plaintiff claims that "the ALJ erred in failing to give weight to the findings of headaches, right hand tremors, and somatization disorder, discounting the physicians without clear and convincing reasons," but does not identify what medical opinion evidence she is referring to. (Doc. 12 at 33). To the extent Plaintiff

means to argue that the ALJ did not provide sufficient reasons for discounting Dr. Watkins' consultative examination report and Dr. McElhinny's neuropsychological consultation report, the Court is not persuaded. As discussed above, both opinions are consistent with and support the ALJ's step two determination that Plaintiff's hand tremor and somatization disorder were not severe impairments.

To the extent Plaintiff takes the position that the ALJ erroneously discounted Dr. Watkins' opinion regarding her headaches, she is mistaken.  Dr. Watkins addressed Plaintiff's headaches in his report, but did not identify any corresponding functional limitations. (Doc. 10, at 478). He stated that Plaintiff has

> [s]evere head pain, likely from stress headaches, but also relatively unknown. No diagnostic etiology has been clarified at this point. Per my exam it does appear that these are related to her stress, anxiety, and depression, and other psychological factors. There was no way to reproduce the headaches without light, but her symptoms are not typical of migraine. There is not aura, there is no other objective measure for this headache.

(Doc. 10, at 478).

The ALJ considered Dr. Watkins' opinion as to the nature of Plaintiff's headaches, and agreed that her headaches were a severe impairment. (Doc. 10, at 29-30). The ALJ found based on subsequent treatment notes from other treating providers that over time, Plaintiff's headaches had shown some improvement on medication therapy. (Doc. 10, at 30, citing Doc. 12 at 493, 495, 497, 503, 541, 545, 566, 568). The ALJ also noted that Plaintiff had not required emergency room care or an inpatient hospital stay for her headaches, and found it significant that despite

14

allegations of headaches since the age of 12, Plaintiff had been able to work at the level of substantial gainful activity for years and engage in a range of basic daily activities. (Doc. 10, at 30, citing Doc. 12, at 210-213, 249-256). As explained by the ALJ, she accounted for Plaintiff's headache disorder by limiting her to work involving only simple judgments and decisions, and only occasional changes in a routine work setting.[1] (Doc. 10, at 28, 30). Dr. Watkins did not identify any headache related functional limitations, and Plaintiff has not shown that the ALJ erred in evaluating the persuasiveness of his opinion.

To the extent Plaintiff simply summarizes the medical records and contends the ALJ should have given more weight to various treatment notes, she has not shown that the ALJ erred. An ALJ is not required to discuss every treatment note in the record. See *Schmitz v. Saul*, 857 Fed. Appx 368 (9th Cir. May 21, 2021) (citing *Vincent v. Heckler*, 739 F.2d 1393, 1394-95 (9th Cir. 1984)). Treatment notes generally do not constitute medical opinions the ALJ must weigh. Treatment notes must include opinions regarding Plaintiff's limitations or ability to work to be considered a medical opinion. *See* 20 C.F.R. § 416.913(a)(2) and 20 C.F.R. § 4041513(a)(2) ("A medical opinion is a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or

---

[1] Plaintiff's argument that the ALJ did not "incorporate headaches into the vocational consultant's hypothetical" is thus incorrect. (Doc. 12, at 28).

more impairment-related limitations or restrictions" in your work-related abilities.).

Because Plaintiff does not explain the significance of any particular treatment notes or point to any specific functional limitations identified in the treatment notes that she claims the ALJ should have incorporated into the residual functional capacity, she has not shown that the ALJ erred in her evaluation of the medical opinion evidence.

## C.   Social Security Ruling (SSR) 19-4p

Plaintiff argues the ALJ failed to consider SSR 19-4p when evaluating her headaches.[2]  (Doc. 12, at 12, 28).  As its title reflects, SSR 19-4p applies to "cases involving primary headache disorders." SSR 19-4p, 2019 WL 4169635 (Aug. 26, 2019). The ruling provides guidance on how the ALJ is to determine whether the claimant has a primary headache disorder, and distinguishes secondary headaches that are typically symptoms of another underlying medical condition. SSR-19-4p, 2019 WL 4169635, at *6. The ruling explains that the ALJ will consider the following combination of findings in determining whether the claimant has a

---

[2]  Plaintiff also argues the ALJ improperly discounted her testimony as to the severity of her headache-related pain and limitations. (Doc. 12, at 28). As discussed below, however, the ALJ provided clear and convincing reasons supported by substantial evidence for discounting this aspect of Plaintiff's testimony.

primary headache disorder: a primary headache disorder diagnosis from an acceptable medical source; an observation of a typical headache event, and a detailed description of the event including all associated phenomena, by an acceptable medical source; remarkable or unremarkable findings or laboratory tests; and response to treatment.

SSR 19-4p further explains that "[p]rimary headache disorder is not a listed impairment in the Listing of Impairments (listings); however, we may find that a primary headache disorder, alone or in combination with another impairment(s), medically equals a listing," specifically Listing 11.02 for epilepsy. SSR-19-4p, 2019 WL 4169635, at * 7. Listing 11.02 requires dyscognitive seizures, occurring once or more per week for at least three consecutive months despite adherence to prescribed treatment; or dyscognitive seizures occurring once or more every two weeks for at least three consecutive months despite adherence to prescribed treatment, with marked limitation in one area of functioning. SSR-19-4p, 2019 WL 4169635, at * 7.

Having determined at step two that Plaintiff's headaches were a severe impairment, the ALJ addressed SSR 19-4p at step three in considering whether Plaintiff had a primary headache disorder that might meet or equal the criteria of Listing 11.02. (Doc. 10, at 25-26). The ALJ found that Plaintiff's headaches did not meet the criteria under SSR 19-4p for a primary headache disorder because her

17

"headaches appear to be longstanding and associated with traumatic injuries she sustained at a very young age." (Doc. 10, at 26). See SRR 19-4p (instructing that "[w]e will not establish secondary headaches (for example, headache[s] attributed to trauma or injury to the head or neck or to infection)" as a primary headache disorder "because secondary headaches are symptoms of another underlying medical condition"). The ALJ further found that Plaintiff's "headaches appear[ed] to be less frequent, intense, and persistent than required under SSR 19-4p, and found that her headaches did not cause a marked limitation in any area of mental or physical functioning. (Doc. 10, at 26). Accordingly, the ALJ found that Plaintiff's headache disorder did not meet or equal the criteria of Listing 11.02 for disability based on a primary headache disorder.

The ALJ thoroughly addressed the medical evidence relating to Plaintiff's headaches, including Dr. Watkins' consultative examination report, when evaluating Plaintiff's residual functional capacity. As discussed above, Dr. Watkins did not identify any headache related functional limitations. The ALJ found based on based on subsequent treatment notes from other treating providers that over time, Plaintiff's headaches had shown some improvement on Lamictal. (Doc. 10, at 30, citing Doc. 12 at 493, 495, 497, 503, 541, 545, 566, 568). Again, the ALJ observed that Plaintiff had not required emergency room care or an inpatient hospital stay for her headaches, and found it significant that despite

18

allegations of headaches since the age of 12, Plaintiff had been able to work at the level of substantial gainful activity for years and engage in a range of basic daily activities. (Doc. 10, at 30, citing Doc. 12, at 210-213, 249-256).

The ALJ also found it significant that Plaintiff had "not required abortive agents or injections for severe headaches." (Doc. 10, at 30). Plaintiff takes issue with this statement, and argues the ALJ overlooked evidence that she was referred for Botox injections for her headaches in July 2020. (Doc. 12, at 9). Plaintiff relies on a single treatment note from Dr. Bryan, who recommended at a visit on July 7, 2020 that Plaintiff "[c]onsider a trial of Botox for headache (possibly tension type)" and stated that he had spoken with Plaintiff and she was "thinking about whether she [would] like to proceed." (Doc. 10, at 648). Dr. Bryan advised Plaintiff "to contact Dr. McNamara's office is she decides she would like to be evaluated for Botox." (Doc. 10, at 648). It appears that Plaintiff did not proceed, as she does not point to any evidence that she ever sought or received any Botox injections for her headaches.

Finally, contrary to Plaintiff's argument that the ALJ did "not incorporate headaches into the vocational consultant's hypothetical" (Doc. 12, at 28), the ALJ expressly accounted for Plaintiff's headache disorder by limiting her to work involving only simple judgments and decisions, and only occasional changes in a routine work setting. (Doc. 10, at 28).

For these reasons, the Court finds the ALJ properly considered and applied SSR 19-4p, reasonably evaluated the medical evidence relating to Plaintiff's headaches, and adequately accounted for the effects of her headaches in the residual functional capacity assessment.

### D.   Subjective Symptom Testimony

Plaintiff argues the ALJ failed to provide clear and convincing reasons for discounting her subjective testimony, including particularly her testimony as to the severity of her headaches and hand tremors, and her need to sleep daily for relief of headaches and fatigue. (Doc. 12, at 21, 25).

The ALJ must follow a two-step process when evaluating a claimant's subjective symptom testimony. *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035-36 (9th Cir. 2007). At step one, "the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged." *Lingenfelter*, 504 F.3d at 1036. If the claimant meets this initial burden, at step two the ALJ may discredit the claimant's subjective symptom testimony about the severity of her symptoms "only by offering specific, clear and convincing reasons for doing so." *Lingenfelter*, 504 F.3d at 1036.

Here, the ALJ found Plaintiff met her initial burden because she produced evidence of medically determinable impairments that could reasonably be expected

to cause her alleged symptoms. The ALJ then found that Plaintiff's statements concerning the intensity, persistence and limiting effects of her symptoms were not entirely consistent with the medical and other evidence in the record. (Doc. 10 at 29).

Plaintiff testified that her hand tremor was so severe that she had difficulty writing and using utensils. (Doc. 10, at 48-49, 57-58). Plaintiff testified that in her last job as a cook she had difficulty holding utensils and bowls of food because her hands would tremble, and explained that she sometimes dropped dishes because she had no grip strength. (Doc. 10, at 48-49). Plaintiff described having headaches multiple times every week, accompanied by extreme light sensitivity which caused her to wear sunglasses, even inside. (Doc. 10, at 56). Plaintiff claimed that her headaches were exacerbated by background noise, making it difficult for her to concentrate. (Doc. 10, at 54). Plaintiff further testified that she could only walk one to two blocks before experiencing shortness of breath and pain in her knees, ankles, feet, and toes. (Doc. 10, at 51-52). Plaintiff estimated that she could stand for only five to ten minutes before she would need to stop and take a break due to fatigue. (Doc. 10, at 52). She described taking naps during the day, lasting from 30 minutes to five or six hours, because she feels exhausted all the time and has headaches. (Doc. 10, at 58-60). Plaintiff further testified that she does not

remember things, cannot concentrate, and her thoughts are always scrambled.

(Doc. 10, at 60-61).

The ALJ summarized Plaintiff's subjective testimony, but discredited her statements as to the severity of her symptoms and limitations for three reasons. (Doc. 10, at 29). First, the ALJ found that Plaintiff's allegations were not consistent with the objective medical evidence. (Doc. 10, at 29-31). Contrary to Plaintiff's testimony that her hand tremor was so severe that she had difficulty holding things, the ALJ pointed out during her step two analysis that motor testing showed normal and symmetric strength in the upper extremities. (Doc. 10, at 23). The ALJ also cited Dr. Watkins's finding that she could handle objects with both gross and fine manual motor dexterity. (Doc. 10, at 32, 478). And while Plaintiff alleged having several debilitating headaches every week, the ALJ noted there was no evidence of any aura with her headaches and Dr. Watkins found no objective measures for her headaches. (Doc. 10, at 30). Contrary to Plaintiff's testimony that she could not concentrate or remember things and her thoughts were always scrambled, the ALJ cited Dr. Watkins' findings that her memory and concentration were only mildly diminished, and her general fund of knowledge, insight, and judgment were intact. (Doc. 10, at 30, 475).  The ALJ reasonably found that Plaintiff's testimony as to the severity of her symptoms and resulting limitations was not entirely consistent with objective medical evidence. See *Rollins v.*

*Massanari*, 261 F.3d 853, 857 (9th Cir. 2001) ("While subjective pain testimony cannot be rejected on the sole ground that it is not fully corroborated by objective medical evidence, the medical evidence is still a relevant factor in determining the severity of the claimant's pain and its disabling effects."); *Carmickle v. Commissioner, Social Sec. Admin.*, 533 F.3d 1155, 1161(9th Cir. 2008) ("Contradiction with the medical record is a sufficient basis for the rejecting the claimant's subjective testimony.")

Second, the ALJ reasonably found Plaintiff's testimony as to the debilitating severity of her headaches was not entirely consistent with evidence that her headaches showed some improvement with medication and were treated conservatively, without abortive agents or injections. (Doc. 10, at 30).  See *Tommasetti v.* Astrue, 533 F.3d 1035, 1039-40 (9th Cir. 2008) (a claimant's favorable response to conservative treatment undermines subjective reports regarding disabling pain); *Parra v. Astrue*, 481 F.3d 742, 751 (9th Cir. 2007) (evidence of conservative treatment is sufficient to discount a claimant's testimony regarding the severity of an impairment).

Finally, the ALJ discounted Plaintiff's testimony based on inconstancies between her allegations and her reported daily activities. (Doc. 10, at 31). In particular, the ALJ cited a December 2018 function report on which Plaintiff indicated she could handle personal care, take care of her pets, prepare meals, and

perform household chores such as washing dishes, mopping, and vacuuming, albeit with some difficulty. (Doc. 10, at 31, 251). Plaintiff also reported walking and shopping, and engaging in hobbies such as rock hunting and taking slow walks. (Doc. 10, at 31, 253; See also Doc. 10, at 61-62). While these daily activities are fairly limited, the ALJ reasonably found the fact that were not entirely consistent with her testimony that she had difficulty holding utensils and other objects, and could not stand for more than a few minutes at a time or walk more than a block or two. (Doc. 10, at 31). See e.g. *Orn v. Astrue*, 495 F.3d 625, 639 (9th Cir. 2007) (holding that an ALJ can consider a claimant's ability to perform daily activities when assessing subjective symptom testimony).

Plaintiff maintains the ALJ erred by not expressly addressing the side effects of her medication when evaluating her subjective testimony and evaluating her residual functional capacity. See Social Security Ruling 16-3p, 2017 WL 5180304, at *7-8,  (side effects of medications are a factor to be considered when evaluating subject pain and symptom testimony); SSR 96-8p, 1996 WL 374184, at *5 (side effects of medications are a factor to be considered when evaluating residual functional capacity). To the extent the ALJ erred by not specifically discussing the side effects of Plaintiff's medications, the error was harmless. To begin with, it is not entirely clear what alleged side effects Plaintiff maintains the ALJ should have addressed, and what medication was the alleged cause. As discussed above, the

medical records reflect that Plaintiff's headaches showed improvement on Lamictal. Plaintiff does point to any objective evidence demonstrating that Lamictal or any other medication caused notable side effects, or any medical opinion evidence that her medications cause any side effects severe enough to interfere with her ability to work. See *Bayliss v. Barnhart*, 427 F.3d 1211, 1217 (9th Cir. 2005) (holding that the failure to explicitly address medication side effects is not an error where the claimant's alleged side effects were not supported by the record); *Thomas v. Barnhart*, 278 F.3d 947, 960 (9th Cir. 2002). Thus, Plaintiff has not met her burden of demonstrating the ALJ harmfully erred by not specifically discussing the alleged side effects of her medications.

The Court may not substitute its own, or the Plaintiff's, interpretation of the evidence for the ALJ's reasonable interpretation. *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th. Cir. 2002). See also *Andrews v. Shalala*, 53 F.3d 1035, 1039-40 (9th Cir. 1995) (Even if the record is "susceptible to more than one rational interpretation," if the ALJ's decision is supported by substantial evidence it must be upheld."). Therefore, the Court concludes the ALJ provided clear and convincing reasons, supported by substantial evidence in the record, for partially discounting Plaintiff's testimony as to the extent of her symptoms and limitations.

### E.    Lay Witness Statement

Plaintiff next argues that the ALJ erred in failing to address a lay witness

statement provided by her sister, Jane Palin. In November 2017, Palin wrote a letter describing the head injury Plaintiff experienced as child, stating that "somewhere along the way" Plaintiff developed a tremor in her right hand, and explaining that Plaintiff stopped working in 2015 to help take care of their father. (Doc. 10, at 224-25).  Palin stated that Plaintiff's physical and mental health had increasingly declined, and she could no longer work due to her various impairments. (Doc. 10, at 224-25).

It is well-established in the Ninth Circuit that the "ALJ must consider lay witness testimony concerning a claimant's ability to work." *Stout v. Commissioner*, 454 F.3d 1050, 1053 (9th Cir. 2006) (citing *Dodrill v. Shalala*, 12 F.3d 915, 919 (9th Cir. 2003); 20 C.F.R. §§ 404.1513(d)(4) & (e), 416.913(d)(4) & (e)). "If the ALJ wishes to discount the testimony of lay witnesses, he must give reasons that are germane to each witness." *Stout*, 454 F.2d at 1053 (quoting *Dodrill*, 12 F.3d at 919). But if the ALJ provides clear and convincing reasons for rejecting the claimant's own subjective complaints, and the lay witness testimony is similar to the claimant's complaints, then the reasons for discounting the claimant's testimony are also germane to the lay witness and any error in failing to more specifically discuss the lay testimony may be considered harmless. *See Valentine v. Commissioner Soc. Sec. Admin.*, 574 F.3d 685, 694 (9th Cir. 2009) (upholding rejection of family member's testimony, which was similar to the claimant's, for

the same reasons given for rejection of the claimant's testimony); *Molina v. Astrue*, 674 F.3d 1104, 1115-17 (9th Cir. 2012). An error is harmless if it is clear from the record that it was "inconsequential to the ultimate non-disability determination." *Molina v. Astrue,* 674 F.3d 1104, 1115 (9th Cir. 2012).

The ALJ did not address Palin's letter, which was error. The Commissioner argues that any such error was harmless, however, because she did not describe any limitations or symptoms that were not alleged by Plaintiff in her function report and testimony.  The Court agrees.

As discussed above, the ALJ gave clear and convincing reasons for discounting Plaintiff's subjective testimony. Because the ALJ properly discounted Plaintiff's subjective complaints, and Palin's lay testimony substantively mirrored the limitations and symptoms Plaintiff alleged in her own function report and testimony, the Court can confidently conclude that the ALJ's failure to specifically address Palin's letter did not affect the ultimate non-disability determination. Accordingly, the Court finds that the ALJ's error in failing to address the lay witness testimony was harmless.

**F.   SSR 96-8  frequency and duration of medical treatment.**

Finally, Plaintiff argues the ALJ erred in assessing her residual functional capacity because the ALJ failed to consider and discuss the effects of her medical treatment, including specifically the frequency of her medical appointments, as

required by Social Security Ruling (SSR) 96-8p.

SSR 96-8p provides that a residual functional capacity "is an assessment of a claimant's ability to do sustained work-related activities in a work setting on a regular and continuing basis." SSR 96-8p,1996 WL 374184, at *1 (July 2, 1996). "A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR 96-8p,1996 WL 374184, at *1. SSR 96-8p further directs that the residual functional capacity assessment must be based on all of the relevant evidence, including "[t]he effects of treatment, including limitations or restrictions imposed by the mechanics of treatment (e.g., frequency of treatment, duration, disruption to routine, side effects of medication)." SSR 96-8p,1996 WL 374184, at *5 (July 2, 1996).

The ALJ's failure to consider the effects of treatment, including the frequency of medical appointments, may constitute reversible error. See *Jones v. Kijakazi*, 2022 WL 595729, at *4 (D. Mont. Feb. 28, 2022); *Smither v. Kijakazi*, 2022 WL 522622, at *6 (D. Mont. Feb. 22, 2022); *Childs v. Kijakazi*, 2022 WL 325913, at *8 (D. Mont. Feb. 3, 2022); *Edmunds v. Kijakazi*, 2021 WL 4452762, at *6 (D. Mont. Sept. 29, 2021); *Esman v. Kijakazi*, 2021 WL 5083842, at *7 (D. Mont. Nov. 2, 2021); *Bourcier v. Saul*, 856 Fed. Appx. 687, 691 (9th Cir. 2021).

Plaintiff has culled through her medical records and calculates that she attended 19 medical appointments in seven months of 2017, and 21 medical

appointments in all of 2018. (Doc. 12, at 20; Doc. 17, at 5). Plaintiff claims she attended an average of 2.1 medical appointments per month during the relevant timeframe, and argues the ALJ erred by failing to consider whether the frequency of her medical appointments would interfere with her ability to work on a regular and continuing basis. (Doc. 17, at 5).

In *Bourcier*, an unpublished decision, the Ninth Circuit held without discussion that because the claimant had "had presented evidence sufficient to establish the possibility that the frequency of her medical appointments may inhibit her ability to work on a 'regular and continuing basis," the case was properly remanded "for further consideration and development of the record on this issue." *Bourcier*, 856 Fed. Appx. at 691. The Ninth Circuit instructed that on remand, "[t]he ALJ should consider, for example, the need to schedule all appointments during the workweek or workday, the need to miss an entire workday for each appointment, and whether the need for this number of appointments is ongoing." *Bourcier*, 856 Fed. Appx. at 691.

Here, the ALJ discussed Plaintiff's medical records at length, but did not consider whether the effects of her treatment, particularly the frequency of her medical appointments, could potentially interfere with her ability to work on a regular and continuing basis. As the spate of recent decisions out of this district in the wake of the Ninth Circuit's unpublished decision in *Bourcier* reflect, this was

29

arguably error. See e.g. *Jones*, 2022 WL 595729, at *4; *Smither*, 2022 WL 522622, at *6; *Childs,* 2022 WL 325913, at *8; *Edmunds*, 2021 WL 4452762, at *6; *Esman*, 2021 WL 5083842, at *7.

But even assuming the ALJ erred, Plaintiff has not met her burden of demonstrating that the error in this case was harmful. See e.g. *Shinseki v. Sanders*, 556 U.S. 396, 410 (2009) (the claimant has the burden of demonstrating there are harmful error in the ALJ's decision); *Ludwig v. Astrue*, 681 F.3d 1047, 1054 (9th Cir. 2012) ("The burden is on the party claiming error to demonstrate not only the error, but also that it affected [her] 'substantial rights'."); *McLeod v. Astrue*, 640 F.3d 881, 886087 (9th Cir. 2011) (the claimant has the burden of showing that the ALJ erred and that any error was harmful).

In each of the district court cases cited above, the plaintiff presented the court with similar calculations as to the historical frequency of the claimant's medical appointments. Importantly, the administrative record in each of these cases also contained vocational expert testimony that if an individual were to miss more than a certain number of workdays per month, that individual would be precluded from all work in the national economy. See *Jones*, 2022 WL 595729, at *4 (vocational expert testified that if an individual were to miss more than two workdays in a typical month on at least an occasional basis, that person would not be able to perform any work in the national economy); *Smither*, 2022 WL 522622,

30

at *6 (same); *Childs*, 2022 WL 325913, at *8 (same); *Esman*, 2021 WL 5083842, at *7 (same); *Edmunds*, 2021 WL 4452762, at *6 (vocational expert testified that if an individual were to miss more than three or four workdays in a typical month, that person would not be able to sustain full-time work). Because the claimant in each of these cases presented evidence that the amount of time needed to attend medical appointments could potentially exceed the threshold for permissible monthly absences identified by the vocational expert, the court in each case held that the ALJ's failure to consider the effects of the frequency of the claimant's medical appointments, constituted harmful and reversible legal error. *Jones*, 2022 WL 595729, at *4; *Smither*, 2022 WL 522622, at *6; *Childs,* 2022 WL 325913, at *8; *Esman*, 2021 WL 5083842, at *7; *Edmunds*, 2021 WL 4452762, at *6.

Here, the vocational expert testified in response to one of the ALJ's hypotheticals that if an individual would be off task or absent at least 20 percent of an eight-hour workday and a 40-hour work week, including normal work breaks, there would not be any jobs in the national economy that such an individual could perform on a full time, consistent basis. (Doc. 10, at 66-67). Plaintiff relies on this portion of the vocational expert's testimony to support her argument that the ALJ's failure to consider the frequency of her medical appointments was prejudicial error. (Doc. 17, at 5-6).

But Plaintiff fails to plausibly explain how attending an average of two

medical appointments would result in her being absent from work at least 20 percent of an eight-hour workday and a 40-hour work week, or provide any evidence to that effect. Plaintiff does not point to, and the Court has not found, any medical source opinions in the record stating that Plaintiff would likely be absent from work or miss any particular number hours of work each month due to her impairments or treatment. In addition, Plaintiff has presented no evidence that she would not be able to schedule and attend an average of 2.1 medical appointments a month around her work schedule, and/or schedule more than one appointment on the same day. See *Goodman v. Berryhill*, 2017 WL 4265685, at *4 (W.D. Wash. Sept. 25, 2017) (finding the claimant's "narrative citation to the frequency of his medical appointments" during the relevant period unpersuasive, as "[n]o physician opined that [the claimant] would frequently miss work due to medical appointments" and "[n]othing suggests that [the claimant] could not have scheduled his medical appointments outside of working hours"), affirmed by *Goodman v. Berryhill,* 741 Fed. Appx. (9th Cir. 2018) (unpublished).

An ALJ's failure to consider the frequency of a claimant's medical appointments may provide a sufficient basis for remand based on vocational expert testimony like that provided here. See e.g. *Durham v. Kijakazi*, 2022 WL 594332, at *9 (D. Mont. Feb. 28, 2022) (finding based on similar vocational expert testimony that the ALJ erred by not considering evidence that the claimant

attended an average of between 4.75 to 9.75 medical visits each month).  Here, however, Plaintiff has not demonstrated or provided any reasonable explanation as to how an average of 2.1 medical appointments would result in her being off task for at least 20 percent of an eight-hour workday and a 40-hour work week, even including regularly scheduled breaks.

On this record, the Court finds that the ALJ's failure to address the frequency of Plaintiff's medical appointments did not affect the ultimate non-disability determination and was, at most, harmless error.  See *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012) (an ALJ's error is harmless if it does not affect the ultimate non-disability determination).

## G.    Vocational Expert

Plaintiff argues the ALJ erred by failing to incorporate all of her impairments into the hypothetical question presented to the vocational expert. Hypothetical questions posted to the vocational expert must set out all the limitations and restrictions of the claimant.  *Embrey v. Bowen,* 849 F.2d 418, 422 (9th Cir.1988).  "The testimony of a vocational expert 'is valuable only to the extent that it is supported by medical evidence.'" *Magallanes v. Bowen*, 881 F.2d 747, 756 (9th Cir. 1989) (quoting *Sample v. Schweiker*, 694 F.2d 639, 644 (9th Cir. 1982)).  If the assumptions in the hypothetical are not supported by the record, then the vocational expert's testimony that the claimant could perform other work

existing in the national economy has no evidentiary value. *Embrey*, 849 F.2d at 422.

As discussed above, the Court has determined the ALJ properly weighed medical evidence and provided sufficient reasons for discounting Plaintiff's testimony. The Court has also determined that any error on the ALJ's part in failing to address the frequency of Plaintiff's medical appointments was harmless. The Court finds that the ALJ was not required to include any additional imitations in the residual functional capacity assessment, which was supported by substantial evidence. See *Magallanes v. Bowen*, 881 F.2d 747, 756 (9th Cir. 1989) (the ALJ need not include limitations not supported by substantial evidence). The ALJ permissibly found based on the vocational expert's testimony that Plaintiff was not disabled at step five of the sequential evaluation process.

## IV.   <u>Conclusion</u>

For the reasons discussed above, the Court concludes the ALJ's decision is based on substantial evidence and free of prejudicial legal error. Accordingly,

IT IS ORDERED that the Commissioner's decision is AFFIRMED.

DATED this 13th day of July, 2022.

Kathleen L. DeSoto
United States Magistrate Judge

34